**IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TENNESSEE
EASTERN DIVISION**

| | |
|---|---|
| **CHRISTINE WILLIAMS**, as Administrator ad Litem for the Estate of Sylvainus Cole, III, Deceased, ) ) ) ) | |
| Plaintiff, ) ) | No. _____ |
| VS. ) ) | JURY TRIAL DEMANDED |
| **CORECIVIC OF TENNESSEE, LLC**, **CORECIVIC, INC., ALEXIE PRUITT**, **CHERTERICA NEAL**, and **JOHN DOES**, ) ) ) ) | |
| Defendants. ) | |

**COMPLAINT**

Comes the Plaintiff, Christine Williams, by and through undersigned counsel, and for her cause of action against the Defendants would respectfully show to the Court and Jury as follows:

**PARTIES**

1.1     The Plaintiff, Christine Williams, is the mother of Sylvainus Cole, III ("Decedent") and is the administrator *ad litem* of the Estate of Sylvainus Cole, III.

1.2     Defendant CoreCivic of Tennessee, LLC, is, upon information and belief, a limited liability company organized under the laws of the State of Tennessee, and which has a principal office located at 5501 Virginia Way, Brentwood, TN 37027 and may be served with process through its registered agent CT Corporation System, 300 Montvue Rd., Knoxville, TN 37919.

1.3     Defendant CoreCivic, Inc., is, upon information and belief, a for-profit corporation organized under the laws of the State of Maryland which has a principal office located at 5501 Virginia Way, Brentwood, TN 37027 and may be served with process through its registered agent CT Corporation System, 300 Montvue Rd., Knoxville, TN 37919.

1.4     Defendant Alexie Pruitt, upon information and belief, was, at all times material hereto, a correctional officer at the Whiteville Correctional Facility ("WCF"), and was acting by virtue of their position, under the color of state law and in the course and scope of their employment with the WCF.  Defendant Alexie Pruitt is sued in their individual capacity.

1.5     Defendant Cherterica Neal, upon information and belief, was, at all times material hereto, a correctional officer at the WCF, and was acting by virtue of their position, under the color of state law and in the course and scope of their employment with the WCF. Defendant Cherterica Neal is sued in their individual capacity.

1.6     Defendants John Does are, upon information and belief, employees of Defendants CoreCivic of Tennessee, LLC and CoreCivic, Inc. and, at all times material hereto, were employees and correctional staff at the WCF, and were acting by virtue of their position, under the color of state law and in the course and scope of their employment with the WCF.  Defendants John Does are sued in their individual capacities.

### JURISDICTION

2.1     This Court has jurisdiction over the Federal claims asserted in this action pursuant to 28 U.S.C. § 1331 (Federal Question) and § 1343 (Civil Rights), as well as 42 U.S.C. § 1983.  This court has jurisdiction over the State claims asserted in this action

pursuant to 28 U.S.C. §1347 (Supplemental), as both the State claims and Federal claims form part of the same controversy.  The incidents which give rise to this cause of action occurred within this Court's jurisdiction, and within one year of the filing of this Complaint.

## VENUE

3.1    Venue of this action is proper pursuant to 28 U.S.C. § 1391(b) in that the events giving rise to the action occurred in the Western District of Tennessee, Eastern Division.

## NATURE OF THE CASE

4.1    This action arises under the Eighth Amendment to the United States Constitution and under federal law, specifically, the Civil Rights Act of 1964 (as amended), 42 U.S.C. § 1983 et seq. for violations of the Constitutional Rights of the Decedent, Sylvainus Cole, III.  It also arises under the common law of the State of Tennessee.

## FACTS

5.1    At all times relevant hereto, the Decedent, Sylvainus Cole, III, was an inmate at the Whiteville Correctional Facility located at 1440 Union Springs Rd., Whiteville, TN 38075.

5.2    Currently and at the time of the Decedents incarceration and death, the WCF was a private prison within the State of Tennessee and was owned, operated, maintained, managed, and controlled by Defendants CoreCivic of Tennessee, LLC and CoreCivic, Inc. (hereinafter referred to as the "CoreCivic Defendants").

5.3     The CoreCivic Defendants have statutory authority to operate private prisons in the State of Tennessee under the Private Prison Contracting Act of 1986 (T.C.A. §§ 41-24-101 through 41-24-119).

5.4     The CoreCivic Defendants are required to operate the WCF in compliance with the laws of the State of Tennessee and in compliance with the contract that they have by and between themselves, Hardeman County, and the State of Tennessee.

5.5     At all times relevant hereto, Defendants Pruitt, Neal, and Does were employees of the CoreCivic Defendants and worked at the WCF overseeing and supervising the inmates at the WCF, including the Decedent, and were acting by virtue of their positions, under the color of state law and in the course and scope of their employment with the WCF.

5.6     Each and all of the acts of Defendants involved in this incident were performed under the color and pretense of the constitutions, statues, ordinances, regulations, customs and usages of the United States of America and the State of Tennessee, under color of law, by virtue of their authority and in the course and scope of their contractual obligation and/or employment.

5.7     Decedent became incarcerated at the WCF on or about July 18, 2018, after having begun serving his sentence in 2014 and being housed at other prisons in the State of Tennessee.

5.8     Decedent was serving a sentence of twelve (12) years, and, upon information and belief, at the time of his death, the Decedent only had several more months to serve before he would be released.

5.9     On or about April 3, 2023, the Decedent passed away while in the care, custody, and control of the CoreCivic Defendants at the WCF.

5.10    The cause of the Decedent's death was fentanyl and tramadol toxicity.

5.11    Plaintiff Christine Williams was named Administrator *ad Litem* of the Estate of Sylvainus Cole, III on January 3, 2024. *See* Order Appointing an Administrator Ad Litem, attached as Exhibit 1.

5.12    The Decedent's cause of death could only be caused by ingestion of illegal contraband which had been illegally smuggled into the prison.

5.13    During the time of Decedent's incarceration at the WCF, he was addicted to drugs and had essentially unfettered access to illegal substances, including fentanyl, marijuana, amphetamines, tramadol, and other drugs.

5.14    The Defendants were aware of the Decedent's drug addiction and access to illegal substances during his incarceration at the WCF because the Decedent would routinely refuse periodic drug tests, would test positive for illegal drugs when drug tests were administered, and suffered a prior opioid drug overdose on March 18, 2023, just days before his death on April 3, 2023.

5.15    The Defendants were aware of the wide availability and accessibility that inmates at the WCF had to illegal substances, in particular fentanyl, during the time that the Decedent was incarcerated at the WCF.

5.16    The Defendants were aware of the fact that inmates are many times more likely to exhibit drug dependence or misuse of drugs than non-incarcerated individuals.

5.17   The Defendants were aware of the fact that inmates are faced with both isolation and boredom while in prison which increases an inmate's likelihood to abuse and become addicted to drugs while in prison.

5.18   The Defendants were aware that fentanyl, in particular, poses a severe danger and risk of death to anyone, including inmates, who come into contact with it.

5.19   The Defendants were aware that drug overdose fatalities have continued to dramatically increase in prisons over the past twenty years, including at the WCF.

5.20   Drugs, including fentanyl, were widely available to inmates at the WCF and had previously caused the deaths of other inmates, including the deaths of Darius Dawon Caraway and Chriteris Allen in July and August of 2021.  These deaths are the subject of pending lawsuits filed against the CoreCivic Defendants.  See ***Caraway et al v. CoreCivic, Inc. et al*** (No. 1:22-cv-1150-STA-jay) (W.D. Tenn.)(on appeal after granting of Motion to Dismiss) and ***Williams et al v. CoreCivic, Inc. et al*** (No. 3:22-cv-00571) (M.D. Tenn.)(Motion to Dismiss pending).

5.21   The Defendants were aware that inmates at the WCF, including and specifically the Decedent, were at serious risk of suffering a fatal drug overdose due to fentanyl and other illegal drugs being readily available to inmates.

5.22   The Defendants were aware that the vast majority of illegal contraband available at the WCF was being brought into the prison by corrections officers and staff who worked at the WCF.

5.23   Lack of sufficient staffing directly leads to the increase of illegal substances, including fentanyl, within prisons because existing staff was not sufficient to conduct

proper security searches of individuals entering the prison, including searches of corrections staff.

5.24    The Defendants were aware that in March and April of 2023, during the time immediately prior to the Decedent's death, the WCF was severely understaffed and had nearly 40% of critical corrections positions vacant.

5.25    The serious staffing shortage at the WCF in March and April of 2023, allowed the introduction of illegal contraband, including fentanyl and other drugs, in the prison.

5.26    Lack of sufficient staffing also directly leads to the proliferation of illegal drugs within a prison because there are not enough corrections staff to conduct a sufficient number of periodic sweeps, inspections, and searches for contraband.

5.27    The serious staffing shortage at the WCF in March and April of 2023, contributed to the lack of searches, sweeps, and inspections within the prison to discover the presence of illegal contraband, including fentanyl and other drugs, which had already been brought into the prison.

5.28    Lack of sufficient staffing also directly leads to an inability of correctional staff to respond to and address emergencies, including drug overdoses.

5.29    The serious staffing shortage at the WCF in March and April of 2023, contributed to delayed responses by existing correctional staff to emergencies, including drug overdoses.

5.30    The Defendants were aware that quickly responding to drug overdoses is necessary to protect inmates from death or serious harm in the event illegal drugs are given

to or taken by an inmate.  The Defendants were also aware that TDOC policies mandated the provision of 24-hour a day access to necessary medical care, including emergency care.

5.31    The Defendants were aware that use of Narcan (Naloxone) as soon as possible after an overdose of an opioid, including fentanyl, was necessary to prevent death or serious injury of inmates.

5.32    Lack of sufficient staffing also directly leads to the inability to conduct required head counts and sweeps to both increase security and timely respond to medical emergencies, such as drug overdoses.

5.33    The serious staffing shortage at the WCF in March and April of 2023, contributed to the lack of timely head counts and sweeps being made which increased the presence of illegal drugs and decreased response times to medical emergencies.

5.34    Lack of sufficient staffing also directly leads to the decrease of providing necessary drug rehabilitation and prevention programs in a prison including group therapy and Therapeutic Community ("TCOM") programs.

5.35    In March and April of 2023, the WCF did not offer any group therapy program and only had room for 128 inmates in its TCOM program with 269 inmates on a waitlist, including the Decedent.

5.36    Prison overcrowding also significantly increases the risk of harm to inmates from illegal drugs and decreased response by corrections staff to emergencies.

5.37    In March and April of 2023, the WCF was beyond its maximum operational capacity.  It was at 101% of its operational capacity for inmates.

5.38    In March and April of 2023, the WCF was seriously understaffed and overcrowded.

5.39     On or about April 3, 2023, the Decedent was housed in KD pod of the WCF in cell 206.

5.40     At approximately 5:19 p.m., Defendant Pruitt escorted inmate Roderickus Tate to cell 206 in KD pod and secured him in the cell with the Decedent.

5.41     Upon information and belief, Defendant Pruitt had not conducted a proper search of Mr. Tate prior to securing him in cell 206 with the Decedent.

5.42     Upon information and belief, at that time, Mr. Tate was able to bring fentanyl into his cell due to the lack of search of his person by Defendant Pruitt prior to him being brought to and secured in cell 206.

5.43     Upon information and belief, the fentanyl which caused the Decedent's death was provided by Mr. Tate and brought into the prison by another person due to the lack of sufficient staffing and searches at the WCF.

5.44     No cell checks, security sweeps, or head counts were conducted of KD pod after Mr. Tate was returned to cell 206 until approximately 6:50 p.m., over an hour and a half later.

5.45     During the time between Mr. Tate being brought to cell 206 and the next security round, the Decedent was given or ingested the fentanyl brought by Mr. Tate and began to have an adverse reaction caused by an overdose.

5.46     At approximately 6:50 p.m., Defendant Neal entered KD pod and immediately noticed yelling by inmates in the upper tier.

5.47     Defendant Neal approached cell 206 and noticed the Decedent on the floor and Mr. Tate attempted to administer chest compressions.

9

5.48    Defendant Neal then called a medical code for a possible overdose at 6:56 p.m.

5.49    Defendant Neal did not provide any first aid or medical care to the Decedent nor did Defendant Neal administer any Narcan despite the obvious and suspected overdose.

5.50    Medical staff then arrived at 6:59 p.m., noted that the Decedent had no pulse and was not breathing, and immediately administered Narcan and started CPR.

5.51    Despite medical staff's efforts, the Decedent remained unresponsive and without a pulse and was taken to the onsite medical clinic at the WCF.

5.52    Emergency medical services were called, and the Decedent was transported to Bolivar General where his death was officially pronounced.

5.53    On March 18, 2023, the Decedent had previously overdosed while incarcerated in JE pod at the WCF.

5.54    Because of this overdose, the Decedent was rehoused in KD pod and referred to the withdrawal management unit ("WMU") on March 30, 2023, but was denied admittance and referred instead to the TCOM and placed on the waiting list.

5.55    The Defendants are charged by law and contract to control all materials that enter the WCF.

5.56    The Defendants are charged by law and contract with conducting routine head counts, conducting timely and periodic inspection of the inmates, and conducting timely and periodic inspections and searches of items and property within the WCF in order protect the safety and wellbeing of the inmates that are in their care and custody.

5.57    The Defendants are required to perform these head counts and security sweeps every thirty (30) minutes and never more than an hour between sweeps.

5.58    On April 3, 2023, the Defendants failed to make any cell checks, sweeps or head counts for over an hour and a half immediately prior to the Decedent's death.

5.59    Because Defendant Pruitt failed to conduct a proper inspection of Mr. Tate before returning him to his cell, Mr. Tate was able to bring fentanyl into cell 206 which was given to the Decedent causing his death.

5.60    Because the Defendants failed to perform any cell checks, head counts or sweeps of the Decedent and cell 206 between 5:19 p.m. and 6:50 p.m. on April 3, 2023, the Decedent overdosed on fentanyl and his condition was not discovered in time to administer lifesaving medical treatment, including Narcan.

5.61    The reason no cell checks, head counts or sweeps were done during this time period was due to the failure of the Defendants to properly staff the WCF so that there were correctional staff available to conduct these sweeps in a timely fashion.

5.62    The reason the fentanyl that killed the Decedent was introduced into the WCF in the first place was due to the failure of the Defendants to properly staff the WCF which did not allow the Defendants to conduct proper searches of individuals who were entering the facility and detect illegal contraband.

5.63    This reason the fentanyl that killed the Decedent remained unconfiscated in the prison after it was smuggled in was due to lack of staffing which directly led to the Defendants' failure to properly search and inspect staff, visitors, inmates, and the cells and property of inmates.

5.64    The reason that the Decedent was not provided timely lifesaving medical treatment was because the Defendants did not have enough staff to conduct timely cell checks, sweeps and head counts, did not have staff constantly supervising and/or

monitoring the pod, nor did they provide appropriate means for inmates to make emergency medical calls to staff who were not present in the pod.

5.65    The Defendants knew that illegal contraband, including fentanyl, was regularly entering the WCF.

5.66    The Defendants knew that inmates at the WCF were overdosing on illegal contraband entering the facility and dying from those overdoses.

5.67    The Defendants knew that the use of illegal contraband, such as fentanyl, was highly likely to lead to overdoses and eventual deaths in the WCF.

5.68    The Defendants knew that the death rate in their correctional facilities, including the WCF, exceeded the death rate in other correctional facilities not run by the CoreCivic Defendants.

5.69    The Defendants knew that the WCF was understaffed, especially in regard to critical correctional officer staff.

5.70    In continuing audits by the Tennessee Comptroller of the Tennessee Department of Correction, it was found that the WCF was operating with fewer than the approved correctional officer staff. (See Department of Correction, November 2017, Performance Audit Report a copy of which is attached as Exhibit "2", p. 7; Department of Correction, January 2020, Performance Audit Report a copy of which is attached as Exhibit "3"; and Department of Correction, December 2023, Performance Audit Report a copy of which is attached as Exhibit "4").

5.71    The 2020 audit found that "low staffing coupled with frequent overtime impacted management's ability to provide safe and secure facilities, especially in emergencies". (Exhibit "3", p. 8).

5.72     The 2020 audit found that the CoreCivic Defendants routinely failed to properly report deaths in the private prisons they operated in Tennessee.  (Exhibit "3", p.6).

5.73     The 2020 audit found that CoreCivic Defendants failed to perform mandatory procedures designed to protect and save inmates. (Exhibit "3", p.8).

5.74     The 2020 audit found that over half of the inmate deaths which the CoreCivic Defendants classified as natural deaths were, in actuality, drug overdoses. (Exhibit "3", p. 40).

5.75     The 2020 audit found that at the WCF, twenty-six (26) correctional officer positions were vacant which represented 26% of the correctional officers who were supposed to be employed at the WCF. (Exhibit "3", p.132).

5.76     The 2020 audit found that there were seventy-five (75) overall vacant positions in the WCF. (Exhibit "3", p.136).

5.77     While the 2020 audit showed a vacancy rate of 26% from October 2018 to January 2019, the CoreCivic Defendants made the situation even worse in subsequent years and by 2023, the WCF's correctional staff vacancy rate had increased to 42%.  (Exhibit "4", p. 178).

5.78     In 2020, the audit report found that the CoreCivic Defendants were not accurately reporting staff vacancies.  The report observed:

> Inaccurately reporting and/or omitting staffing and vacancy information on the monthly staffing reports increases the risk that the department may not be able to track CoreCivic's vacant correctional officer positions to meet the security needs of its correctional facilities, thereby preventing the department from properly overseeing CoreCivic's contract requirements.  (Exhibit "3", p. 138).

5.79     It was further observed by the TDOC in the 2020 audit:

> The Department of Correction has issued noncompliance reports for inaccurate monthly staffing reports to contractors of Hardeman Correctional Facility (HCCF),

13

Trousdale Turner Correctional Center (TTCC) and Whiteville Correctional Facility (WCFA). South Central Correctional Facility (SCCF) has has been issued noncompliance reports for vacancies over 45 days. Contractors for all four of the facilities have been assessed liquidated damages. (Exhibit "3", p. 138).

5.80    From July 1, 2020, through June 30, 2022, the Tennessee Department of Correction has assessed approximately $10.8 million in liquidated damages to the CoreCivic Defendants for deficiencies related to staffing. (Exhibit "4", p. 11).

5.81    The CoreCivic Defendants have an established history of failing to fully staff their private prisons to the detriment of the health and safety of inmates, staff, and visitors.

5.82    In 2011, a lawsuit was filed by the American Civil Liberties Union to address staffing issues at CoreCivic's Idaho Correctional Center because the understaffing led to a violent atmosphere at the prison.

5.83    The CoreCivic Defendants settled the lawsuit with the ACLU, agreeing to provide minimum staff levels, but CoreCivic was later held in contempt of court in 2013 because it violated the agreement and falsified records to misrepresent the number of guards on duty.

5.84    In 2014, the FBI opened an investigation of the company based on its billing for "ghost employees," Idaho Governor Butch Otter ordered state officials to take control of the prison, and the company paid the state $1 million for understaffing the prison.

5.85    On or about February 23, 2017, a federal jury found that Defendant CoreCivic, Inc. had violated inmates' Eighth Amendments rights to be free from cruel and unusual punishment by being deliberately indifferent to the serious risk posed by the company's long-standing practice of understaffing the Idaho Correctional Center.

14

5.86     These incidents and the incidents at the WCF are part of a pattern of conduct on the part the CoreCivic Defendants demonstrating that they have a custom and practice of failing to adequately staff the prisons they have contracted to run.

5.87     In the years preceding the events set forth above, the CoreCivic Defendants have paid millions of dollars in settlements around the United States because (1) CoreCivic routinely understaffed its correctional facilities, inevitably resulting in serious security and health risks leading to death of inmates, guards, and staff; and (2) CoreCivic routinely failed to provide adequate medical and mental health care to inmates.

5.88     In 2016, CoreCivic and its directors were sued by company shareholders because, among other things, the company misrepresented its pattern of understaffing and poor medical care, which ultimately led the Federal Bureau of Prisons to cancel its business relationship with Core Civic.

5.89     Notwithstanding these and numerous other warnings, the CoreCivic Defendants have continued to provide inadequate staffing, supervision, and medical care at its facilities, including the WCF.

5.90     The state audit released in 2017 (Exhibit "2") found that the WCF needed 79 officers to cover 17 positions during a shift, but on average the facility provided only 57 officers per shift.

5.91     The CoreCivic Defendants have continued to keep the WCF severely understaffed, including and specific to the present lawsuit during March and April of 2023.

5.92     The CoreCivic Defendants have deliberately provided incomplete information in order to disguise the fact that it was understaffing its facilities, including the

WCF, which likely means that the problem with understaffing is much worse than the audits indicate.

5.93     The state audit released in 2020 (Exhibit "3") found that the CoreCivic Defendants had not properly recorded information about accidents, illnesses, and traumatic injuries at three of its facilities in Tennessee, including the WCF.

5.94     The 2020 audit also found that the WCF was missing nearly one-third of its medical and mental health personnel during two different audit periods and that homicides were two times more likely in CoreCivic facilities than in state-operated facilities.

5.95     The incidents described above – and others like them – demonstrate that the CoreCivic Defendants had a custom and practice of being deliberately indifferent to the health and safety of inmates, including the Decedent.

5.96     Despite the CoreCivic Defendants knowing that they would not be able to provide the staffing required, the CoreCivic Defendants nonetheless promised to provide these services and knew that inadequate supervision, inadequate medical care, inadequate training, and improper inmate segregation practices would lead to the death of inmates, including the Decedent.

5.97     The CoreCivic Defendants were more interested in making a profit and knew that even though inmates like the Decedent were likely going to die due to understaffing at the WCF, they would still make a profit even if they had to pay some measure of liquidated damages.

5.98     The CoreCivic Defendants failed to take reasonable measures to stop, or at least curtail, the influx of illegal contraband into the WCF.

5.99    Due to the CoreCivic Defendants custom and practice of understaffing its prisons, including the WCF, the staff that are hired are not properly trained or supervised to prevent the influx of illegal contraband into the prison.

5.100   The CoreCivic Defendants are tasked with preventing the smuggling of contraband, including illegal drugs like fentanyl, into the WCF.

5.101   The vast majority of illegal contraband coming into the WCF is brought into the prison by staff.

5.102   Due to the severe staffing shortages at the WCF by the CoreCivic Defendants, staff are not properly searched for illegal contraband, and the staff conducting the searched are not properly supervised to ensure that they are performing the task of preventing illegal drugs from entering the WCF.

5.103   The CoreCivic Defendants were aware of the severe staffing shortage at the WCF was causing inadequate training and supervision of staff to prevent smuggling of illegal contraband into the WCF, but the CoreCivic Defendants chose to ignore this problem because even after paying liquidated damages penalties, they could still make a profit.

5.104   The CoreCivic Defendants' staffing shortage custom and practice was present at the WCF before and during the period of March and April 2023 which allowed the illegal drugs to enter the prison and ultimately kill the Decedent.

5.105   The CoreCivic Defendants are tasked with searching persons and property within the WCF to locate and remove illegal contraband, including illegal drugs like fentanyl, which have already been brought into the WCF.

17

5.106   Due to the severe staffing shortages at the WCF by the CoreCivic Defendants, staff, visitors, and inmates and their property are not properly searched for illegal contraband after entering the WCF, and the staff conducting the searched are not properly supervised to ensure that they are performing the task of detecting illegal drugs that have already entered the WCF.

5.107   The CoreCivic Defendants were aware of the severe staffing shortage at the WCF was causing inadequate training and supervision of staff to detect and remove illegal contraband which was already inside the WCF, but the CoreCivic Defendants chose to ignore this problem because even after paying liquidated damages penalties, they could still make a profit.

5.108   The CoreCivic Defendants' staffing shortage custom and practice was present at the WCF before and during the period of March and April 2023 which allowed the illegal drugs to remain in the WCF and ultimately kill the Decedent.

5.109   The CoreCivic Defendants are tasked with protecting inmates at the WCF by providing for their medical needs and responding to emergencies involving the health of inmates.

5.110   Due to the severe staffing shortages at the WCF by the CoreCivic Defendants, staff were not conducting timely head counts and sweeps to discover and respond to the medical emergencies and needs of inmates, and the staff conducting the head counts and sweeps are not properly supervised to ensure that they are performing the task of providing for the medical needs of inmates at the WCF.

5.111   The CoreCivic Defendants were aware of the severe staffing shortage at the WCF was causing inadequate training and supervision of staff who provide for the medical

needs and emergencies of inmates at the WCF, but the CoreCivic Defendants chose to ignore this problem because even after paying liquidated damages penalties, they could still make a profit.

5.112   The CoreCivic Defendants' staffing shortage custom and practice was present at the WCF before and during the period of March and April 2023 which prevented the Decedent's drug overdose from being discovered in time to prevent his death and directly caused or contributed to his death.

5.113   The CoreCivic Defendants failed to provide for alternative means in light of the severe staffing shortage at the WCF for inmates to alert staff of medical emergencies when head counts and sweeps were delayed because of the insufficient staffing.

5.114   The CoreCivic Defendants' decision not to provide alternative means for inmates to alert staff of medical emergencies at the WCF in March and April of 2023 directly lead to the death of the Decedent.

5.115   The CoreCivic Defendants failed to provide for their corrections officers at the WCF to carry Narcan (Naloxone) which can be used to immediately reverse overdose toxicity of opioids, including fentanyl and tramadol.

5.116   The CoreCivic Defendants' decision not to provide Narcan (Naloxone) at the WCF in March and April of 2023 directly lead to the death of the Decedent by requiring medical staff to come to the Decedent's cell after it was too late for the Narcan to reverse the toxic effects of the fentanyl and tramadol.

5.117   Defendants John Does are individuals whose true identities are currently unknown to the Plaintiff, but who are believed to have participated in, facilitated, or otherwise contributed to the wrongful death and violations alleged in this Complaint.

Plaintiffs will seek to amend this Complaint to reflect the true identities of these John Doe defendants once their identities become known through discovery or other means.

5.118   Defendants John Does are individuals who, upon information and belief, were responsible for searching Mr. Tate and failed to properly search him, allowing him to give fentanyl and tramadol to the Decedent which directly led to his overdose and death.

5.119   Defendants John Does are individuals who, upon information and belief, were responsible for monitoring KD pod and immediately responding to any emergencies, including the overdose by the Decedent.

5.120   Defendants John Does are individuals who, upon information and belief, ignored the Decedent's emergency need for medical help which directly led to his overdose and death.

**COUNT I**
(42 USC § 1983 CLAIMS – *Failure to Protect, Failure to Train and Supervise, and Deliberate Indifference to Medical Needs*)

6.1     The Defendants have, under color of state law, deprived the Decedent of rights, privileges and immunities secured by the Eighth Amendment to the United States Constitution, including but not limited to the right to be free from cruel and unusual punishment, the right to be protected, and the right to adequate medical care while incarcerated at the WCF.

6.2     The CoreCivic Defendants have an unconstitutional custom and practice of maintaining staffing levels that are insufficient to ensure that inmates like the Decedent are protected from illegal contraband, such a fentanyl and tramadol, coming into the WCF.

6.3     The CoreCivic Defendants' custom and practice of understaffing the WCF caused the death of the Decedent as described above by allowing illegal drugs to enter and

be distributed throughout the WCF as well as by failing to timely respond to the Decedent's overdose with the appropriate medical treatment.

6.4     The Defendants, collectively and individually, were deliberately indifferent to the Decedent's medical needs as he was suffering from a drug overdose which caused his ultimate death.

6.5     The Defendants, collectively and individually, had actual knowledge of the Decedent's drug addiction, prior overdose, and the serious risk that illegal drugs in the WCF would pose to the Decedent.

6.6     The Defendants, collectively and individually, consciously disregarded the risk to the Decedent that he was at risk of death or serious injury due to the widespread presence of illegal drugs at the WCF and the need to timely monitor and respond to the Decedent's drug overdose.

6.7     Defendant Pruitt was deliberately indifferent to the Decedent's rights by failing to search Mr. Tate who brought illegal drugs into the Decedent's cell on April 3, 2023, which resulted in the Decedent's death.

6.8     Defendant Neal was deliberately indifferent to the Decedent's rights by failing to conduct timely cell checks, sweeps and/or head counts which allowed more than an hour and a half to pass from the time Mr. Tate brought illegal drugs into the Decedent's cell and Defendant Neal calling a medical code without providing Narcan or any other medical care.

6.9     The Defendants' denial of any timely medical treatment constitutes deliberate indifference to a serious medical need.

6.10    Pursuant to statute, the Defendants are liable to Plaintiff for special and general compensatory damages, including but not limited to, emotional, physical, economic, and pecuniary damages, punitive damages, and reasonable attorney's fees and costs.

## COUNT II
### (42 USC § 1983 CLAIMS – *Monell Liability*)

7.1    The CoreCivic Defendants have a custom and practice of severely understaffing its facilities, including the WCF, without regard to inmate safety because understaffing is still profitable even if the CoreCivic Defendants cannot comply with their promise to fully staff the WCF and pay liquidated damages.

7.2    The conduct of the CoreCivic Defendants as described above deprived the Decedent of his right to be free from cruel and unusual punishment, to be protected, and to receive adequate medical care while incarcerated at the WCF.

7.3    The CoreCivic Defendants' custom and practice of severely understaffing the WCF directly led to: 1) to failure to properly search inmates and visitors entering the WCF; 2) failure to properly inspect the person and property of the staff and inmates already in the WCF; 3) failure to properly police the use of illegal contraband in the WCF; 4) failure to discover the emergency condition of the Decedent; and 5) failure to properly respond to the emergency condition of the Decedent.

7.4    The CoreCivic Defendants' failures directly led to the overdose death of the Decedent while he was in the custody and control of the CoreCivic Defendants.

7.5    The CoreCivic Defendants knew of the heightened and chronic safety risks to inmates resulting from understaffing at the WCF in March and April of 2023, but they tolerated, maintained, and promoted understaffing because they could break their promise

to fully staff the WCF and still be profitable even if that was at the expense of the safety of inmates, including the Decedent.

7.6     The CoreCivic Defendants' custom and practice of failing to ensure adequate staffing at the WCF was the moving force behind their staff failing to prevent illegal drugs from entering the WCF, failing to discover illegal drugs already inside the WCF, failing to timely discover the Decedent's medical emergency, and failing to provide for timely medical care for the Decedent.

7.7     The CoreCivic Defendants' custom and practice of understaffing the WCF directly caused the death of the Decedent.

7.8     Pursuant to statute, the CoreCivic Defendants are liable to Plaintiff for special and general compensatory damages, including but not limited to, emotional, physical, economic, and pecuniary damages, punitive damages, and reasonable attorney's fees and costs.

**COUNT III**
TENNESSEE COMMON LAW NEGLIGENCE

8.1     The CoreCivic Defendants, through their agents and/or employees, owed the Decedent a duty to treat the Decedent kindly and humanely; to properly train, supervise, and discipline its employees; to protect the Decedent from unreasonable harm; to protect his life and health; to have its employees refrain from conduct which created an unreasonable risk of injury or death; and to provide him with his obvious medical needs.

8.2     The CoreCivic Defendants, through its agents and/or employees, breached the above-listed duties to the Decedent by failing to fully staff the WCF to prevent illegal drugs from being smuggled into the WCF, to discover and remove illegal drugs already

inside the WCF, to monitor his medical well-being on a periodic bases, and to provide for his medical needs to prevent him from dying from a drug overdose.

8.3     The breach by the CoreCivic Defendants, through its agents and/or employees, was the cause in fact and proximate cause of the damages and injuries the Decedent suffered and constitutes negligence on the part of the CoreCivic Defendants.

8.4     As a direct and proximate result of the negligence of the CoreCivic Defendants the Decedent and his family suffered significant physical, emotional, and economic damages more fully described later in this complaint.

8.5     The negligence of the CoreCivic Defendants was committed by their employees acting within the scope of their employment.

## DAMAGES

9.1     As a direct and proximate result of the improper conduct of the Defendants as described above, the Decedent experienced extreme emotional and physical pain and suffering from the time he began suffering from an overdose until his death.

9.2     As a direct and proximate result of the improper conduct of the Defendants as described above, the Decedent experienced extreme mental anguish from the time he began suffering from an overdose until his death.

9.3     As a direct and proximate result of the improper conduct of the Defendants as described above, the Decedent's medical condition went untreated until it was too late which caused his death.

9.4     As a direct and proximate result of the improper conduct of the Defendants as described above, the Decedent's estate has incurred significant funeral expenses.

9.5     As a direct and proximate result of the improper conduct of the Defendants as described above, the Decedent's family has suffered mental anguish and grief over the loss of the Decedent.

9.6     As a direct and proximate result of the improper conduct of the Defendants as described above, the Decedent's family has suffered the pecuniary loss of the Decedent including a loss of consortium and is entitled to damages for the pecuniary value of the life of the Decedent.

**WHEREFORE, PREMISES CONSIDERED**, Plaintiff respectfully demands judgment against the Defendants to the extent permitted by law, as follows:

1.     That proper process issue and be served upon the Defendants, requiring them to answer this Complaint within the time required by law;

2.     For a jury to try the issues when joined;

3.     For the entry of judgment against the Defendants for compensatory and special damages in an amount proven at trial including but not limited to damages for pain, suffering, mental and emotional distress, and the pecuniary value of the Decedent's life;

4.     For an additional award of punitive damages;

5.     For costs, expenses, and attorney's fees for this action in accordance with 42 U.S.C. 1983 and 1988;

6.     For an order declaring that the Defendants have acted in violation of the United States Constitution;

7.     For an order enjoining the Defendants from engaging in any of the unlawful acts, omissions, or practices complained of herein; and

8.      For such other and further relief as the court deems just and proper.

Respectfully submitted,

 /s/ Leanne A. Thorne
        Leanne A. Thorne, BPR #023481
P. O. Box 262
Lexington, Tennessee 38351
(731) 968-9810
thornelaw@hotmail.com


MOSELEY & MOSELEY
ATTORNEYS AT LAW

BY: /s/ James Bryan Moseley
        James Bryan Moseley, No. 021236

237 Castlewood Drive Suite D
Murfreesboro, Tennessee 37129
(615) 254-0140
Fax: (615) 634-5090
bryan.moseley@moseleylawfirm.com


Evans, Bulloch, and Parker, PLLC

/s/    Luke A. Evans
        Luke A. Evans,        No. 023620
302 North Spring Street
P.O. Box 398
Murfreesboro, Tennessee 37133-0398
(615) 896-4154
lukeevans@bfhelaw.com

*Attorneys for Plaintiff*