IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TENNESSEE
EASTERN DIVISION

CHRISTINE WILLIAMS, as )
Administrator ad Litem for the Estate )
of Sylvainus Cole, III, Deceased, )
)
    Plaintiff, )
)
v. )     Case No. 1:24-cv-01074-JDB-jay
)
CORECIVIC OF TENNESSEE, LLC, )
CORECIVIC, INC., ALEXIE PRUITT, )
CHERTERICA NEAL and JOHN DOES, )
)
    Defendants. )

---

ORDER GRANTING DEFENDANTS' MOTION TO DISMISS AMENDED COMPLAINT

---

Before the Court is the October 8, 2024, motion of the Defendants, CoreCivic of Tennessee,

LLC, CoreCivic, Inc., Alexie Pruitt, and Cherterica Neal, to dismiss the Plaintiff's, Christine

Williams, as Administrator ad Litem for the Estate of Sylvanius Cole, III, Deceased, amended

complaint.  (Docket Entry ("D.E.") 24.)  Plaintiff has responded (D.E. 27) and Defendant replied

(D.E. 28).  For the following reasons, Defendant's motion is GRANTED.

I.       FACTUAL BACKGROUND[1]

Sylvanius Cole, III was an inmate in the custody of Whiteville Correctional Facility (the

"WCF") before he tragically passed away on April 3, 2023.  (D.E. 20 at PageID 363, 365, 369–

---

[1] The following facts are derived from Plaintiffs' amended complaint (D.E. 20) and are
accepted as true for purposes of this motion.  *See Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009); *Bell
Atl. Corp. v. Twombly*, 550 U.S. 544, 555–56 (2007); *see also Parry v. Mohawk Motors of Mich.,
Inc.*, 236 F.3d 299, 306 (6th Cir. 2000) (citing *In re Atlas Van Lines, Inc.*, 209 F.3d 1064, 1067 (8th
Cir. 2000)) (explaining that when a plaintiff files an amended complaint, the amended complaint
is the controlling pleading).

70.)  The WCF is a private prison owned, operated, maintained, managed, and controlled by Defendants CoreCivic of Tennessee, LLC and CoreCivic, Inc. (collectively, "CoreCivic"). (*Id.* at PageID 363.)  CoreCivic has statutory authority to operate private prisons in the State of Tennessee pursuant to the Private Prison Contracting Act of 1986, Tenn. Code Ann. §§ 41-24-101 through 41-24-119, and is required to operate the the WCF in compliance with Tennessee law and their contractual obligations.  (*Id.* at PageID 364.)  Plaintiff alleges that CoreCivic acted under the color of state law at all times relevant to this action.  (*Id.*)  Defendants Alexie Pruitt, correctional officer at the WCF, Cherterica Neal, correctional officer at the WCF, and John Does were employed by CoreCivic at the time of Cole's death and were acting under the color of state law and in the course and scope of their employment with the WCF.  (*Id.*)

On April 3, 2023, at approximately 5:19 p.m., Defendant Pruitt escorted Roderickus Tate to cell 206 in the KD pod and secured him there with Cole without Tate undergoing a proper search. (*Id.* at PageID 369.) Consequently, Tate was able to bring fentanyl into the cell; fentanyl that Plaintiff alleges "was brought into the prison by another person due to the lack of sufficient staffing and searches at the WCF."  (*Id.*)  For the next hour and a half no cell checks, security sweeps, or head counts were conducted of KD pod.  (*Id.*)  At some point during that time, Cole ingested the fentanyl "and began to have an adverse reaction cause by an overdose."  (*Id.*)  Neal entered KD Pod at approximately 6:50 p.m. and heard inmates yelling in the upper tier.  (*Id.*)  As Neal approached cell 206, she saw Cole on the floor and Tate attempting to administer chest compressions.  (*Id.*)  At 6:56 p.m. Neal called a medical code for a possible overdose.  (*Id.* at PageID 370.)  After calling the code, she did not administer first aid or medical care to Cole.  (*Id.*) Medical staff arrived at the cell about three minutes later and immediately administered Naloxone ("Narcan") and began CPR. (*Id.* at PageID 368, 370.) Despite these efforts, Cole remained

unresponsive and was taken to the WCF medical clinic.  (*Id.* at PageID 370.)  At some point thereafter, emergency medical services were contacted and Cole was transported to Bolivar General where he died from fentanyl and tramadol toxicity.  (*Id.* at PageID 365, 369.)

During his time at the WCF, Cole "was addicted to drugs and had essentially unfettered access to illegal substances."  (*Id.* at PageID 365.) Plaintiff alleges that Defendants knew of the "wide availability and accessibility" that the WCF inmates had to these substances, and, specifically, of Cole's addiction and access to these illegal substances.  (*Id.*)  The deceased would routinely refuse periodic drug tests, would test positive for illegal drugs when tests were administered, and suffered a prior opioid drug overdose while in JE pod on March 18, 2023.  (*Id.* at PageID 365, 370.)  After the March 18 overdose and following a denial of admittance into the withdrawal management unit, Cole was moved to KD pod and placed on the waitlist for a Therapeutic Community program.  (*Id.* at PageID 368, 370.)  Plaintiff submits that Corecivic did not investigate the source of the drugs on which he overdosed.  (*Id.* at PageID 381.)

Plaintiff attributes Cole's death to CoreCivic engaging in a purposeful staffing shortage, "inadequate supervision, inadequate medical care, and improper inmate segregation practices," in order to maximize profits.  (D.E. 20 at PageID 376.)  According to the complaint, CoreCivic's insufficient staffing led to an increased presence of illegal substances in the WCF, "because existing staff was not sufficient to conduct proper security searches of individuals entering the prison, including searches of corrections staff."  (*Id.* at PageID 366–67.) In the period immediately preceding Cole's death, March and April of 2023, the WCF was allegedly understaffed and overcrowded, with "nearly 40% of critical corrections positions vacant," while at "101% of its operational capacity for inmates."  (*Id.* at PageID 367–68.)  The staffing shortage contributed to a lack of searches, sweeps, and inspections within the prison, a decrease in drug rehabilitation and

prevention programs within the facility, and the inability for staff to timely respond to and address emergencies. (*Id.* at PageID 367–68.) The lack of searches and sweeps provided inmate Tate the opportunity to bring fentanyl into his shared cell with Cole, which, combined with CoreCivic's failure to provide Narcan to corrections officers at the WCF, ultimately led to Cole's overdose and death. (*Id.* at PageID 371–72, 379.)

Plaintiff refers to three performance audit reports on the WCF in her complaint, issued in 2017, 2020, and 2023. (*Id.* at PageID 372.) These audits, conducted by the Tennessee Comptroller of the Tennessee Department of Correction, detailed the WCF's staffing shortages. (*Id.* at PageID 372, 375.) Specifically, the 2017 audit "found that 79 officers were required to cover 17 positions during a shift, but on average the facility only provided 57 officers per shift." (*Id.* at PageID 375.) The 2020 audit report stated that "low staffing coupled with frequent overtime impacted management's ability to provide safe and secure facilities, especially in emergencies." (*Id.* at PageID 372.) The audit found that there were 26 vacant correctional officer positions and 75 overall vacant positions. (*Id.* at PageID 373.) Plaintiff maintains that these incidents of understaffing demonstrate that CoreCivic "had a custom and practice of being deliberately indifferent to the health and safety of inmates, including [Cole]." (*Id.* at PageID 376.)

Finally, Plaintiff brings claims against Pruitt and Neal in their individual capacities. Plaintiff contends that Pruitt knew that because of the widespread availability of illegal substances at the WCF, inmate Tate "was likely to possess drugs and bring them to [Cole]" if he was not properly searched and that a failure to search put Cole at a serious risk of death from an overdose. (*Id.* at PageID 381.) Pruitt was deliberately indifferent "to [Cole's] rights by failing to search Mr. Tate," resulting in Tate bringing fentanyl into the shared cell and Cole's death. (*Id.* at PageID 384.) Likewise, Neal knew that due to the proliferation of drugs at the WCF, absent monitoring and

4

supervision through regular sweeps and cell checks, Cole was likely to obtain drugs, putting him at serious risk of death. (*Id.* at PageID 382.)    Neal also knew that in the event of an overdose, calling medical would not be enough to save Cole's life, rather he would need Narcan to be administered immediately. (*Id.*)  Neal was deliberately indifferent "to [Cole's] rights by failing to conduct timely cell checks, sweeps and/or head counts which allowed more than an hour and a half to pass from the time Mr. Tate brought illegal drugs into [Cole's] cell and . . . calling a medical code without providing Narcan or any other medical care." (*Id.* at PageID 384.)

In Plaintiff's amended complaint, she asserts claims based on failure to protect, failure to supervise, deliberate indifference to medical needs, and *Monell* liability pursuant to 42 U.S.C. § 1983, as well as negligence pursuant to Tennessee common law. (*Id.* at PageID 383–87.)  Plaintiff seeks compensatory and punitive damages, as well as declaratory and injunctive relief. (*Id.* at PageID 388–89.)

II.    STANDARD OF REVIEW

Federal Rule of Civil Procedure 12(b)(6) permits a court to dismiss a complaint for "failure to state a claim upon which relief can be granted." Fed. R. Civ. P. 12(b)(6).  In determining if dismissal is appropriate, the court "must accept the complaint's well-pleaded factual allegations as true, construe the complaint in the light most favorable to the plaintiff, and draw all reasonable inferences in the plaintiff's favor." *Luis v. Zang*, 833 F.3d 619, 626 (6th Cir. 2016) (citing *Bassett v. Nat'l Collegiate Athletic Ass'n*, 528 F.3d 426, 430 (6th Cir. 2008).  "However, 'a legal conclusion couched as a factual allegation' need not be accepted as true." *Gavitt v. Born*, 835 F.3d 623, 640 (6th Cir. 2016) (quoting *Twombly*, 550 U.S. at 555).

To survive, "a complaint must state a claim to relief that rises 'above the speculative level' and is 'plausible on its face.'" *Luis*, 833 F.3d at 625 (quoting *Hensley Mfg. v. ProPride, Inc.*, 579

F.3d 603, 609 (6th Cir. 2009)).  "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* (quoting *Iqbal*, 556 U.S. at 678).  Because it is "context-specific," a court must rely upon its experience and common sense to ascertain whether a claim is plausible. *Creative Bus., Inc. v. Covington Specialty Ins. Co.*, 559 F. Supp. 3d 660, 665 (W.D. Tenn. 2021) (citing *Iqbal*, 556 U.S. at 679).  "[I]f it appears beyond doubt that the plaintiff can prove no set of facts . . . that would entitle [them] to relief, then . . . dismissal is proper." *Smith v. Lerner, Sampson & Rothfuss, L.P.A.*, 658 F. App'x 268, 272 (6th Cir. 2016) (third alteration in original) (quoting *Greenberg v. Life Ins. Co. of Va.*, 177 F.3d 507, 515 (6th Cir. 1999)).  Although a court typically should not regard matters outside the pleadings, it "may consider exhibits attached to the complaint, public records, items appearing in the record of the case, and exhibits attached to defendant's motion to dismiss, [if] they are referred to in the complaint and are central to the claims contained therein." *Gavitt*, 835 F.3d at 640 (first citing *Kreipke v. Wayne State Univ.*, 807 F.3d 768, 774 (6th Cir. 2015); and then citing *Bassett*, 528 F.3d at 430).  The amended complaint references four exhibits.  Although no exhibits are attached to the amended complaint, the original complaint did include Exhibits 1, 2, and 3, and a reading of the amended complaint makes clear that its references are to those originally filed documents.  Exhibit 4 is addressed in the next section.

III.    ANALYSIS

a.  *The 2023 Audit*

Before evaluating Defendants' motion to dismiss on the merits, the Court must determine whether it can consider the December 2023 performance audit report as part of the pleadings.  In paragraph 5.70, Williams states that a copy of the "Department of Correction, December 2023,

6

Performance Audit Report" is attached to the amended complaint at Exhibit "4." (D.E. 20 at PageID 372.) However, Plaintiff failed to attach this exhibit. (*See id.*) She refers to this exhibit explicitly at two other times, in paragraphs 5.77 and 5.80. (*Id.* at PageID 373–74.) In a footnote in their motion to dismiss, Defendants state, "[t]hough referenced as 'Exhibit 4' in the Amended Complaint, it does not appear that Plaintiff actually filed the 2023 Audit with the Amended Complaint" and provide the Court with a link to a PDF of the 2023 audit that was published on the State of Tennessee Comptroller's website. (D.E. 24-1 at PageID 412.) Defendants also refer to the audit in the body of their motion to dismiss. (*Id.*)

As explained above, at the motion to dismiss stage, a court should not consider matters outside the pleadings, with certain exceptions. *Gavitt*, 835 F.3d at 640. If matters outside the pleadings are considered, then the motion to dismiss must be converted into one for summary judgment. Fed. R. Civ. P. 12(d). The Sixth Circuit has adopted a "liberal view of what matters fall within the pleadings for purposes of Rule 12(b)(6)." *Armengau v. Cline*, 7 F. App'x 336, 344 (6th Cir. 2001). "If referred to in a complaint and central to the claim, documents attached to a motion to dismiss form part of the pleadings . . . courts may also consider public records, matters of which a court may take judicial notice, and letter decisions of governmental agencies." *Id.* (citing *Jackson v. City of Columbus*, 194 F.3d 737, 745 (6th Cir. 1999)). Materials which "merely 'fill in the contours and details' of a complaint . . . add nothing new and may be considered without converting the motion to one for summary judgment." *Id.* (quoting *Year v. Goodwill Indus.-Knoxville, Inc.*, 107 F.3d 443, 445 (6th Cir. 1997)).

The 2023 audit report is the type of document that courts have found to be appropriate for judicial notice at the motion to dismiss stage. A court may "judicially notice a fact that is not subject to reasonable dispute because it: (1) is generally known within the trial court's jurisdiction;

or (2) can be accurately and readily determined from sources whose accuracy cannot reasonably be questioned." Fed. R. Evid. 201. A court "may take judicial notice on its own; or . . . must take judicial notice if a party requests it and the court is supplied with the necessary information." *Id.* Additionally, "the Court may take judicial notice of public records and government documents available from reliable sources on the Internet." *Roane Cnty v. Jacobs Eng. Grp., Inc.*, No. 3:19-cv-206-TAV-HBG, 2020 WL 2025613, at *3 (E.D. Tenn. Apr. 27, 2020) (quoting *Mitchell v. Tenn. Valley Auth.*, No. 3:14-CV-360-TAV-HBG, 2015 WL 1962203, at *4 n.2 (E.D. Tenn. Apr. 30, 2015)) (taking judicial notice of a memorandum published on the Tennessee Valley Authority's website); *Grimes v. Navigant Consulting, Inc.*, 185 F. Supp. 2d 906, 913 (N.D. Ill. 2002) ("[A] district court may take judicial notice of well-publicized stock prices." (quoting *Ganino v. Citizens Utilities Co.*, 228 F.3d 154, 167 n.8 (2d Cir. 2000)); *Cali v. E. Cost Aviation Servs., Ltd.*, 178 F. Supp. 2d 276, 287 (E.D.N.Y. 2001) (taking judicial notice of documents from Pennsylvania state agencies and Federal Aviation Administration). Here, the 2023 audit report is cited in the amended complaint to support Plaintiff's contention that CoreCivic engaged in a practice of understaffing that led to a proliferation of illegal substances within the WCF and ultimately led to the death of Sylvanius Cole, III, making it central to her claim. Moreover, the report was published by the Comptroller of the State of Tennessee, has been made available to the public on the State of Tennessee's government website, and the parties have not disputed its authenticity. (*See* D.E. 20 & 24-1.) Thus, the Court will take judicial notice of the 2023 audit report and will not convert the motion to dismiss into one for summary judgment. The parties are reminded that, under Local Rule 7.1, "[a]ll documents referenced as exhibits or attachments to an electronically filed document shall be submitted in electronic form, as electronic attachments to the main document." L.R. 7.1.

      *b.  § 1983 Claims*

42 U.S.C. § 1983 provides that "[e]very person who, under color of any statute, ordinance, regulation, custom, or usage, of any State . . . subjects, or causes to be subjected, any citizen of the United States . . . to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured."  To state a claim under that section, a plaintiff must allege two elements: (1) a deprivation of rights "secured by the 'Constitution and laws' of the United States," and (2) that a defendant caused harm while acting under color of state law.  *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 150 (1970).  Plaintiff alleges violations of Cole's rights to be protected and to adequate medical care under the Eighth Amendment to the United States Constitution.  Defendants argue that Plaintiff has failed to plead sufficient facts to demonstrate that Cole suffered a constitutional deprivation.

       i.  CoreCivic Defendants

The Sixth Circuit has explained that "a private corporation that performs the traditional state function of operating a prison acts under color of state law for purposes of § 1983."  *Thomas v. Coble*, 55 F. App'x 748, 748 (6th Cir. 2003) (citing *Street v. Corrs. Corp. of Am.*, 102 F.3d 810, 814 (6th Cir. 1996)).  The standards for assessing municipal liability are applied to claims against private corporations that operate prisons or provide medical care to prisoners.  *Id.* at 748–49; *Street*, 102 F.3d at 817–18.  CoreCivic "cannot be held liable under a theory of respondeat superior."  *Braswell v. Corrs. Corp. of Am.*, 419 F. App'x 622, 627 (6th Cir. 2011) (citing *Monell v. Dep't of Soc. Servs.*, 436 U.S. 658, 691–92 (1978)).  To prevail on a § 1983 claim against CoreCivic, Plaintiff "must show that a policy or well-settled custom of the company was the 'moving force' behind the alleged deprivation" of Cole's rights.  *Id.* (citing *Miller v. Sanilac*, 606 F.3d 240, 254–55 (6th Cir. 2010)).

As the United States Supreme Court has explained,

> [l]ocating a "policy" ensures that a municipality is held liable only for those deprivations resulting from the decisions of its duly constituted legislative body or of those officials whose acts may fairly be said to be those of the municipality. Similarly, an act performed pursuant to a "custom" that has not been formally approved by an appropriate decisionmaker may fairly subject a municipality to liability on the theory that the relevant practice is so widespread as to have the force of law.

*Bd. of the Cnty. Comm'rs v. Brown*, 520 U.S. 397, 403–04 (1997) (citations omitted).  Further, "[a] custom can be one of action or inaction and need not be formally approved by the entity." *Schenk ex rel. Ev M v. Thomas*, NO. 22-cv-01268-STA-jay, 2023 WL 5108594, at *3 (W.D. Tenn. Aug. 9, 2023) (quoting *City of Canton v. Harris*, 489 U.S. 378, 404 (1989)).   A "causal connection" between the custom or policy and the alleged constitutional violation must be established for liability to attach.  *Id.* (quoting *Oklahoma City v. Tuttle*, 471 U.S. 808, 823–24 (1985)).  "Thus, a plaintiff must 'identify the policy, connect the policy to the [entity] itself, and show that the particular injury was incurred because of the execution of that policy.'" *Id.* (quoting *Garner v. Memphis Police Dep't*, 8 F.3d 358, 364 (6th Cir. 1993)).

### A.  Failure to Protect

The threshold question is whether Plaintiff has alleged an underlying constitutional violation.  The Eighth Amendment's prohibition against cruel and unusual punishment imposes a duty on prison officials to "provide humane conditions of confinement; prison officials ensure that inmates receive adequate food, clothing, shelter, and medical care, and must 'take reasonable measures to guarantee the safety of the inmates.'" *Farmer v. Brennan*, 511 U.S. 825, 832 (1994) (quoting *Hudson v. Palmer*, 468 U.S. 517, 526–27 (1984)); *see also* U.S. Const. amend. VIII.  An Eighth Amendment violation consists of both objective and subjective components.

"The objective prong of a failure-to-protect claim requires an analysis of the risk to the injured party before the alleged injury occurred. This analysis must consider the likelihood of harm

to the injured party in the context of the circumstances that led to the injury." *Zakora v. Chrisman*, 44 F.4th 452, 469 (6th Cir. 2022) (first citing *Reedy v. West*, 988 F.3d 907, 909, 912–14 (6th Cir. 2021); and then citing *Schack v. City of Taylor*, 177 F. App'x 469, 472 (6th Cir. 2006)).  Death following an overdose does not "independently establish the objective prong."  *Id.* at 470; *see also Caraway v. CoreCivic of Tenn., LLC*, 98 F.4th 679, 685 (6th Cir. 2024) ("The relevant constitutional 'injury' is the exposure to an objectively excessive risk, *not* any physical harm that befalls the inmate because of that risk.")  In *Zakora*, the Sixth Circuit held that

> simple exposure to drugs, without more, does not violate contemporary standards of decency and thus does not satisfy the objective prong. Prison officials are not required to show that they have prevented all drugs from entering their facility in order to be protected from liability. Instead, we hold that unfettered access to drugs in a prison, as evidenced here by the officials' failure to promptly investigate the two prior overdoses in Zakora's C-Unit, is sufficiently serious to satisfy the objective prong of an Eighth Amendment claim.

44 F.4th at 472.  In *Caraway*, the circuit court explained that three alleged facts drove their conclusion in *Zakora*:

> First, the complaint contained detailed allegations about the "widespread presence of drugs" at Zakora's facility. Second, in the two days before Zakora's overdose, two other inmates in his twelve-to-sixteen-inmate unit had also overdosed. Third, prison officials failed to investigate those overdoses.  Taken together, those factual allegations permitted the reasonable inference that Zakora had "unfettered access to deadly drugs" in prison, creating an objectively excessive risk of overdose.

98 F.4th at 684 (citations omitted).

The first key fact present in *Zakora* is arguably present here. While Plaintiff's claim of a "widespread presence of drugs" in the WCF is not supported by the same type of "detailed allegations" as were present in *Zakora*, *see* 44 F.4th at 461 (alleging basketballs containing illegal drugs were being tossed over the fence of the facility and that a prisoner had informed an inspector at the facility of a "drug-smuggling" ring and provided details "of how the drugs were coming in and who was providing them"), she does contend that Cole "would routinely refuse periodic drug

tests, would test positive for illegal drugs when drug tests were administered, and suffered a prior opioid drug overdose on March 18, 2023." (D.E. 20 at PageID 365.) These allegations plausibly allege a widespread presence of drugs at the WCF. However, she has not alleged the other two key facts present in *Zakora*. She points to Cole's prior overdose that was not investigated; but, unlike in *Zakora*, where the prior overdoses and the failure to investigate the same took place in the same small unit and in the two days prior to Zakora's overdose, Cole's prior overdose and the alleged failure to investigate took place in a different unit, two weeks before. There are no allegations of prior overdoses or access to drugs in the KD unit where Cole was housed at the time of his fatal overdose. Importantly, analysis of the objective prong "must consider the likelihood of harm to the injured party *in the context of the circumstances that led to the injury*." *Zakora*, 44 F.4th at 472 (emphasis added) (first citing *Reedy*, 988 F.3d at 909, 912–914; and then citing *Schack*, 177 F. App'x at 472). The relevant context here is the KD unit in the time immediately preceding Cole's overdose and death and Plaintiff has not alleged a presence of illegal substances nor a failure to investigate in this pod.

Plaintiff insists that CoreCivic engaged in deliberate understaffing, which led to the deprivation of Cole's constitutional rights. (D.E. 20 at PageID 385–86.) As explained in *Caraway*, "the failure to adequately staff a prison—even a deliberate failure—is not itself a constitutional violation." 98 F.4th at 685 (citing *Agramonte v. Shartle*, 491 F. App'x 557, 560 (6th Cir. 2012)). Instead,

> a § 1983 plaintiff must plausibly show a causal connection between the defendant's act or omission and his injury. In a failure-to-protect claim, the injury is deliberate exposure to excessive risk of serious harm. Thus, the plaintiff must show that the defendants' unconstitutional act or omission failed to alleviate the excessive risk he faced.

*Id.* (citations omitted). Plaintiff avers that "[l]ack of sufficient staffing directly leads to the increase of illegal substances, including fentanyl, within prisons because existing staff was not sufficient to

conduct proper security searches of individuals entering the prison, including searches of corrections staff." (D.E. 20 at PageID 366–67.) These allegations are similar to those found to be insufficient in *Caraway*. 98 F.4th at 686 ("The complaint contains only generalized allegations that Whiteville's understaffing 'led to' rampant drug use, apparently in part because officials couldn't perform adequate head counts and inspections. That kind of conclusory statement, unaccompanied by factual support, receives no presumption of truth." (first citing *Iqbal*, 556 U.S. at 678; and then citing *Chapman v. City of Detroit*, 808 F.2d 459, 465 (6th Cir. 1986)). Plaintiff does claim that understaffing "contributed to the lack of searches, sweeps, and inspections within the prison to discover the presence of illegal contraband, including fentanyl and other drugs, which had already been brought into the prison" and attempts to support this claim with the assertion that an hour and a half went by without a head count or security sweep prior to Cole's death, in violation of the set requirement. (*Id.* at PageID 367, 371.) However, this assertion alone is insufficient to demonstrate more than a "mere possibility" that understaffing is what led to the violation and Cole's death. *Caraway*, 98 F.4th at 686.

For these reasons, Plaintiff's allegations do not rise to the level of "sufficiently serious" to satisfy the objective prong of the failure-to-protect claim. *See Farmer*, 511 U.S. at 834 (quoting *Wilson v. Seiter*, 501 U.S. 294, 298 (1991)).

Even if the objective prong were satisfied, Plaintiff fails to plead the subjective prong. To be held liable under the deliberate-indifference standard, a prison official must "know[] of and disregard[] an excessive risk to inmate health or safety. The official must both be aware of facts from which the inference could be drawn and that a substantial risk of serious harm exists, and he must also draw the inference." *Zakora*, 44 F.4th at 472 (citation omitted). "A factfinder may conclude that a prison official knew of a substantial risk from the very fact that the risk was

obvious." *Farmer*, 511 U.S. at 842 (citation omitted). "[T]he correct inquiry is whether [the defendant] had knowledge about the substantial risk of serious harm to a particular class of persons, not whether he knew who the particular victim turned out to be." *Zakora*, 44 F.4th at 472 (second alteration in original) (quoting *Taylor v. Mich. Dep't of Corr.*, 69 F.3d 76, 81 (6th Cir. 1995)). Plaintiff contends that "Defendants, collectively and individually, had actual knowledge of [Cole's] drug addiction, prior overdose, and the serious risk that illegal drugs in the WCF would pose to [him]" and that they disregarded this risk. (D.E. 20 at PageID 384.) While Plaintiff has sufficiently pled that, based on Cole's prior overdose and positive drug screens, Defendants had knowledge of the risk that illegal substances in the prison posed to him; Plaintiff has not pled that they disregarded this risk. She cites three performance audit reports for the Department of Correction, issued in 2017, 2020, and 2023. As the Sixth Circuit recognized in *Caraway*, the 2017 and 2020 audits indicated that CoreCivic "responded reasonably" to its staffing problem. 98 F.4th at 687 (noting that the 2017 audit showed increases in officers' salaries and a reworked training program and the 2020 audit showed improvement in staffing at "critical posts"); *see also* (D.E. 1-7 at PageID 55; D.E. 1-8 at PageID 222.) Moreover, the 2023 report states that, while staffing shortages remain a concern among CoreCivic facilities, the WCF "showed the most improvement [in correctional officer vacancy rates] over the two-year period, with a decrease in vacancies of 10% from fiscal year 2022 to fiscal year 2023." Division of State Audit, Tenn. Comptroller of the Treasury, *Performance Audit Report: Department of Correction* 11, 178 (Dec. 2023). This improvement occurred during the period of Cole's incarceration at the WCF. *Id.*; (D.E. 20 at PageID 364 (stating Cole began his incarceration at the WCF in 2018).) Finally, as to Cole himself, after his overdose in the JE pod, he was moved to the KD pod and referred to the withdrawal management unit. (D.E. 20 at PageID 370.) When that unit could not accept him, Cole was placed

on the waitlist for the therapeutic community program.  (*Id.*)  Thus, the complaint demonstrates that the CoreCivic Defendants responded reasonably to the risk of harm to Cole.

For the reasons set forth above, Plaintiff has failed to satisfy either component of her failure-to-protect claim against the CoreCivic Defendants.

## B.  Failure to Provide Adequate Medical Care

Plaintiff next alleges that CoreCivic's custom or practice of understaffing deprived Cole of the right to adequate medical care while incarcerated.  (D.E. 20 at PageID 383.)  Claims for failure to provide adequate medical care are also reviewed under the Eighth Amendment's prohibition against cruel and unusual punishment.  *See generally Wilson v. Seiter*, 501 U.S. 294, 297 (1991). A plaintiff "must allege acts or omissions sufficiently harmful to evidence deliberate indifference to serious medical needs." *Estelle v. Gamble*, 429 U.S. 97, 106 (1976).   Like claims for failure to protect, claims for failure to provide adequate medical care consist of objective and subjective components.  *Farmer*, 511 U.S. at 834; *Hudson v. McMillian*, 503 U.S. 1, 8 (1992); *Wilson*, 501 U.S. at 298.   The objective component requires that a prisoner have a "'sufficiently serious' medical need."  *Blackmore v. Kalamazoo Cnty.¸* 390 F.3d 890, 895 (6th Cir. 2004) (first citing *Farmer*, 511 U.S. at 834; and then cting Estelle, 429 U.S. at 104); *Brooks v. Celeste*, 39 F.3d 125, 127–28 (6th Cir. 1994).  "[A] medical need is objectively serious if it is 'one that has been diagnosed by a physician as mandating treatment *or* one that is so obvious that even a lay person would easily recognize the necessity for a doctor's attention.'"  *Blackmore*, 390 F.3d at 897 (quoting *Gaudreault v. Mun. of Salem*, 923 F.2d 203, 208 (1st Cir. 1990)); *see also Johnson v. Karnes*, 398 F.3d 868, 874 (6th Cir. 2005).  The Sixth Circuit has "held that 'the objective prong is usually met' in overdose cases 'where death results from a failure to provide medical services, and there is evidence that lay persons, . . . recognized the necessity for a doctor's attention."  *Burwell v. City of Lansing*, 7 F.4th 456, 464 (6th Cir. 2021)  (alteration in original) (quoting

*Hinneburg v. Miron*, 676 F. App'x 483, 486–87 (6th Cir. 2017)).  "[I]t is sufficient to show that [the prisoner] actually experienced the need for medical treatment, and that the need was not addressed within a reasonable time frame." *Id.* at 463 (quoting *Blackmore*, 390 F.3d at 900).  In cases where an inmate is experiencing symptoms of an overdose, the response time is critical.  *See, e.g., id.* at 465 (finding the objective component was met where video evidence showed inmate laid unconscious in his own vomit for two hours without any movement).

Here, Plaintiff contends that there were no "cell checks, security sweeps, or head counts" within KD pod between 5:19 p.m. and 6:50 p.m. and during that period Cole ingested the drugs brought to him by Tate and "began to have an adverse reaction caused by an overdose."  (D.E. 20 at PageID 369.)  At 6:50 p.m., Neal entered the pod, heard inmates yelling, then approached Cole's cell and saw him on the floor with Tate attempting chest compressions.  (*Id.*)  At 6:56 p.m., Neal called a medical code for a possible overdose and medical staff arrived three minutes later.  (*Id.* at PageID 370.)  Cole was administered Narcan, and, because he remained unresponsive, was then taken to the onsite medical clinic.  (*Id.*)  Williams maintains that there was a delay in medical care due to the failure to conduct a cell check, security sweep, or head count, in the hour and a half before Neal entered the unit. (*Id.* at PageID 371.)  Plaintiff attributes the alleged failure to timely respond to CoreCivic's understaffing.  (*Id.* at PageID 384.)  However, Plaintiff does not present any facts that indicate what physical symptoms of an overdose Cole experienced prior to Neal's arrival at his cell or when he began to experience symptoms within the hour and a half without a cell check.  What is submitted is that when Neal heard yelling coming from the area of Cole's cell, he arrived at that location within six minutes, and, upon seeing Cole on the floor with Tate giving chest compressions, called a medical code.  (*Id.* at PageID 369–70.)  Three minutes later, medical staff arrived and administered Narcan.  (*Id.* at PageID 370.)  Plaintiff has established that

16

laypersons recognized the need for medical care; however, she has not proven the denial of the same. Thus, the objective prong has not been satisfied.

Plaintiff also fails to satisfy the subjective prong. To establish this aspect, she must demonstrate that the prison official acted with the requisite intent, that is, that he had a "sufficiently culpable state of mind." *Wilson*, 501 U.S. at 298. For claims of failure to provide adequate medical care, a plaintiff must show that the prison officials acted with "deliberate indifference" to a substantial risk that the prisoner would suffer serious harm. *Farmer*, 511 U.S. at 843 (citing *Helling v. McKinney*, 509 U.S. 25, 35 (1993)); *Dominguez v. Corr. Med. Servs.*, 555 F.3d 543, 550 (6th Cir. 2009); *Woods v. Lecureux*, 110 F.3d 1215, 1222 (6th Cir. 1997). Deliberate indifference describes a state of mind more blameworthy than negligence. *Farmer*, 511 U.S. at 835. A prison official cannot be found liable under the Eighth Amendment unless that person subjectively knows of an excessive risk of harm to an inmate's health or safety and disregards that risk. *Id.* at 837. "[A]n official's failure to alleviate a significant risk that he should have perceived but did not" does not amount to cruel and unusual punishment. *Id.* at 838.

Plaintiff alleges that the CoreCivic Defendants "were aware that use of Narcan . . . as soon as possible after an overdose of an opioid, including fentanyl, was necessary to prevent death or serious injury of inmates" and yet failed to provide Narcan to their corrections officers. (D.E. 20 at PageID 368, 379.) She contends that the "decision not to provide Narcan . . . at the WCF in March and April of 2023 directly lead to the death of the Decedent by requiring medical staff to come to [Cole's] cell after it was too late for the Narcan to reverse the toxic effects of the fentanyl and tramadol." (*Id.* at PageID 379.) Finally, she maintains that the failure to supply officers with Narcan and denial of timely medical treatment constituted deliberate indifference to Cole's medical needs. (*Id.* at PageID 384–86.)

17

Like with the failure-to-protect claim, Plaintiff attempts to link CoreCivic's understaffing to the denial of timely medical treatment. Despite the conclusory allegation that understaffing led to a failure to timely respond, she presents no evidence to support this claim. Defendant rightly notes that there are no facts in the complaint "to show when specifically [Cole] overdosed, how long he had overdosed when discovered by staff, [or] how more staffing would have allowed staff to discover [Cole's] situation sooner." (D.E. 24-1 at PageID 417.) Moreover, failure to conduct a timely cell check may rise to the level of negligence but it does not demonstrate deliberate indifference. *See Burwell*, 7 F.4th at 471 ("And failing to follow internal policies, without more, does not constitute deliberate indifference.") Plaintiff has thus failed to establish a causal link between understaffing and an alleged denial of timely medical treatment.

Regarding the failure to provide officers with Narcan, the deliberate indifference standard requires a showing that a prison official both knew of and disregarded a substantial risk to inmate safety. When evaluating the sufficiency of a plaintiff's deliberate indifference claim, "the Court must view the surrounding circumstances, including the extent of the injury, the realistic possibilities of treatment, and the possible consequences to the prisoner of failing to provide immediate medical attention." *Glen v. Apol*, Case No. 1:17-cv-545, 2019 WL 3805476, at *6 (W.D. Mich. July 19, 2019) (citing *Westlake v. Lucas*, 537 F.2d 857, 860 n.4 (6th Cir. 1976)). As detailed above, Plaintiff has failed to plead sufficient facts to indicate that the CoreCivic Defendants subjectively knew of the excessive risk of harm to Cole created by the failure to provide Narcan to prison officials or that this risk was disregarded.

For the reasons set forth above, Plaintiff has not satisfied either component of her failure to provide adequate medical care claim against the CoreCivic Defendants.

*C.* Monell *Liability*

Because the Court has not found an underlying constitutional violation, it need not reach the question of whether liability may be imposed pursuant to *Monell v. Department of Social Services of the City of New York*, 436 U.S. 658 (1978).[2]  *Caraway*, 98 F.4th at 683 ("The estate seeks to impose *Monell* liability on the corporate defendants.  But because the complaint doesn't allege an underlying constitutional violation, those claims fail." (citing *Baynes v. Cleland*, 799 F.3d 600, 622 (6th Cir. 2015)); *see also Wilson v. Morgan*, 477 F.3d 326, 340 (6th Cir. 2007) ("There can be no *Monell* municipal liability under § 1983 unless there is an underlying unconstitutional act.").  Even if there were an underlying constitutional violation, as explained in the preceding sections, Plaintiff has not established a causal connection between CoreCivic's understaffing or failure to equip prison officials with Narcan and the alleged violations.

ii.    Defendant Pruitt

Plaintiff asserts a failure-to-protect claim against Pruitt.  The subjective component for a failure-to-protect claim requires a plaintiff to demonstrate that a prison official both "[knew] of and disregard[ed] an excessive risk to inmate health or safety.  *Farmer*, 511 U.S. at 837.  Williams maintains that Pruitt "knew that due to the widespread availability of drugs at the WCF that Mr. Tate was likely to possess drugs and bring them to [Cole] if he was not properly search[ed] before being returned to his cell" and that Pruitt's failure to search Mr. Tate constituted deliberate indifference. (*Id.* at PageID 369, 371, 381, 384.)   However, Plaintiff has not offered "any factual details to support [this] conclusion—such as how [Pruitt] obtained that knowledge, when [he] obtained it, or what that knowledge entailed."  *Caraway*, 98 F.4th at 686 (citing *Zakora*, 44 F.4th

---

[2] Plaintiff states that staff were not properly supervised throughout the complaint but always in the context of her claim that CoreCivic purposefully understaffed the WCF.  (*See* D.E. 20 at PageID 377–78, 383.)  It is not separately pled under Count II of the amended complaint.  (*See id.* at PageID 385–86.)  Thus, the Court finds that Plaintiff has failed to assert *Monell* liability on a failure to supervise theory.

at 468.)  For example, there are no allegations of how Pruitt came to know of the widespread availability of drugs at WCF, much less how he knew Tate was likely to possess and bring drugs to Cole.  Plaintiff's general statement does not demonstrate that Pruitt "subjectively knew [Cole] faced an excessive risk of harm." *Id.* (citing *Zakora*, 44 F.4th at 473.)  Accordingly, Williams has failed to state a failure-to-protect claim against Pruitt and such claim is DISMISSED.

iii.    Defendant Neal

Plaintiff asserts claims for failure to protect and failure to provide adequate medical care against Neal.  First, Plaintiff asserts that Neal "knew that due to the widespread availability of drugs at the WCF that [Cole] would likely obtain drugs if not monitored and supervised through regular sweeps and cell checks," that Cole was at risk of a drug overdose, and "that he would likely be at serious risk of death if he was not monitored and supervised through regular sweeps and cell checks to respond to any overdose that would occur."  (D.E. 20 at PageID 382.)  She maintains that Neal demonstrated deliberate indifference "by failing to conduct timely cell checks, sweeps and/or head counts which allowed more than an hour and a half to pass from the time Mr. Tate brought illegal drugs into [Cole's] cell."  (*Id.* at PageID 384.)  Again, these allegations fall short of what is required for the subjective component of a failure-to-protect claim.  Plaintiff presents no facts as to when or how Neal obtained knowledge regarding the widespread presence of drugs at the WCF, knowledge that Cole "would likely" obtain drugs absent regular sweeps and cell checks, or knowledge that Cole would likely be at serious risk of death absent timely sweeps and cell checks.  Because Plaintiff has not demonstrated Neal's subjective knowledge of a risk of serious harm to Cole, the failure-to-protect claim against him is DISMISSED.

Next, Plaintiff asserts that Neal demonstrated deliberate indifference by "calling a medical code without providing Narcan or any other medical care."  (*Id.*)  As explained above, the deliberate indifference standard is that the Defendant knew of and disregarded an excessive risk to

20

inmate health or safety. *Farmer*, 511 U.S. at 837. When Neal heard commotion surrounding Cole's cell, he approached the cell, saw Cole on the floor with Tate conducting chest compressions, then called a medical code for a possible overdose. (D.E. 20 at PageID 369–70.) Rather than disregard an excessive risk to Cole's health or safety, on recognizing the need for medical intervention, Neal summoned the medical staff who then provided Narcan. This action cannot be said to constitute deliberate indifference.

Plaintiff has thus failed to state a claim for failure to provide adequate medical care against Neal and such claim is DISMISSED.

### iv. John Does

Plaintiff sues Defendants John Does who "are individuals whose true identities are currently unknown to the Plaintiff, but who are believed to have participated in, facilitated, or otherwise contributed to the wrongful death and violations alleged." (D.E. 20 at PageID 379.) She claims these individuals failed to properly search Tate, were responsible for monitoring KD pod and responding to emergencies, and ignored Cole's emergency need for medical help. (*Id.* at PageID 380.) The John Does are yet to be identified and the time for service has expired. Fed. R. Civ. P. 4(m). The action against these Defendants is thus DISMISSED without prejudice pursuant to Federal Rule of Civil Procedure Rule 4(m).

### c. *State Law Claim*

Finally, the Court declines to exercise supplemental jurisdiction over Plaintiff's state law claim. Where "there is some basis for original jurisdiction, the default assumption is that the court will exercise supplemental jurisdiction over all related claims." *Millinder v. Hudgins*, 421 F. Supp. 3d 549, 564 (W.D. Tenn. 2019) (quoting *Veneklase v. Bridgewater Condos, L.C.*, 670 F.3d 705, 716 (6th Cir. 2012)). However, 28 U.S.C. § 1367(c) provides that "[t]he district courts may decline to exercise supplemental jurisdiction . . . if . . . the district court has dismissed all claims over

which it has original jurisdiction."  Because the Court is dismissing all of Plaintiff's federal claims under 42 U.S.C. § 1983, it declines to retain jurisdiction over Plaintiff's Tennessee common law claim.  *See Artis v. District of Columbia*, 583 U.S. 71, 74 (2018) ("When district courts dismiss all claims independently qualifying for the exercise of federal jurisdiction, they ordinarily dismiss as well as all related state claims." (citing 28 U.S.C. § 1367(c)(3)).  Therefore, that claim is DISMISSED WITHOUT PREJUDICE.

IV.    CONCLUSION

For the reasons stated, the motion of Defendants CoreCivic, Neal, and Pruitt, to dismiss Plaintiff's amended complaint is GRANTED.  The Clerk is DIRECTED to enter judgment.

IT IS SO ORDERED this 28th day of March 2025.

s/ J. DANIEL BREEN
UNITED STATES DISTRICT JUDGE

22